NOT DESIGNATED FOR PUBLICATION

No. 118,925

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIAM GREGORY BOYD JR.,
*Appellant*.


MEMORANDUM OPINION


Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed May 31, 2019. Convictions affirmed, sentences vacated, and remanded with directions.


*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.


*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before LEBEN, P.J., GREEN and POWELL, JJ.


PER CURIAM: William Gregory Boyd Jr. directly appeals his convictions and sentences, arguing: (1) the prosecutor committed prosecutorial error during voir dire; (2) the district court clearly erred in failing to give a limiting instruction with the admission of his prior bad acts or other crimes evidence under K.S.A. 60-455; (3) the district court erred in ordering him to pay the victim restitution; and (4) the district court abused its discretion in denying him a dispositional departure to probation. We agree with Boyd that he was entitled to have the district court consider the merits of his downward dispositional departure motion at sentencing, and because the record is unclear to us

1

whether that was done, we vacate Boyd's sentence and remand for that purpose. We affirm the district court in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

The incidents resulting in Boyd's convictions occurred between August 2011 and May 2013. Boyd moved into and lived with V.D.—his girlfriend—at her home in 2010. V.D. lived with her daughter, S.D.A., and her youngest son. Boyd lived there for about five years until the relationship ended.

S.D.A. was a freshman in high school in 2011. Around the start of the school year, Boyd inappropriately touched S.D.A. while the two wrestled or play/fought. S.D.A. thought Boyd had accidentally touched her—she thought he might have touched her breast—and then he got between her legs and kissed her vaginal area over her clothing. Around Christmas of 2011, S.D.A. and Boyd were in the basement, and Boyd performed oral sex on S.D.A. S.D.A. stated she did not want it to happen, but he would start suggesting and touching her; she would tell him to stop, but he continued.

S.D.A. stated Boyd performed oral sex on her a couple more times, and he then asked her and she performed oral sex on him. When S.D.A. was still 14 years old, she had sexual intercourse with Boyd. S.D.A. stated that it started with oral sex, and he then unzipped his pants and put his penis inside her vagina. S.D.A. estimated she had sexual intercourse with Boyd over 100 times, and it would sometimes occur between two to five times a week. S.D.A. stated the sexual relationship continued throughout her time in high school and after Boyd moved out of the house. S.D.A. stated that Boyd had told her that he was addicted to her and he would release her when she turned 18.

Boyd's biological daughter S.B.—who is about one month older than S.D.A.—stated that when she was 15 years old she saw S.D.A. performing oral sex on Boyd and,

2

another time, witnessed Boyd performing oral sex on S.D.A. She did not tell anyone about what she saw until the police contacted her when she was 16 or 17 years old. Overland Park Police Department Officer Casey Shearer stated S.B. informed him she was 17 years old when she observed Boyd and S.D.A., but S.B. testified that she had incorrectly told police that she was 17 years old when she witnessed the two events.

S.D.A. did not disclose or admit to the sexual relationship with Boyd until after Boyd moved out in 2015 and her mother confronted her about Boyd. V.D. stated she grew more suspicious when S.D.A. stayed over at Boyd's house until 3 a.m. one night and she confronted S.D.A. about a text message from Boyd. S.D.A. told her mother that she had deleted the text message but later admitted that she had had a relationship with Boyd that started during her freshman year in high school. S.D.A. testified she did not know why she did not tell her mother before and that she felt ashamed and embarrassed.

After S.D.A. told V.D., the two went to the police station. Upon speaking with police, S.D.A. agreed to undergo a sexual assault examination. However, once S.D.A. spoke with a nurse at the hospital, S.D.A. declined the examination because she had taken a shower after the last incident and did not believe the nurse could recover any evidence. Shearer testified that Boyd denied having any sexual contact with S.D.A. during an interview and stated S.D.A. was like a daughter to him.

The State later charged Boyd with one count of aggravated indecent liberties with a child in violation of K.S.A. 2012 Supp. 21-5506(b)(1) and one count of criminal sodomy in violation of K.S.A. 2012 Supp. 21-5504(a)(3). During the opening statements at trial, defense counsel argued that S.D.A. had a troubled upbringing and that she told a "story" about an alleged sexual relationship with Boyd to permanently remove Boyd from the house because of a pattern of instability in her life. At trial, S.D.A. denied making up a story so that Boyd would not come back to the house.

3

On cross-examination, V.D. confirmed it was a part of S.D.A.'s life to see Boyd leave and reenter the house. V.D. confirmed that Boyd often yelled at and was argumentative with people and that she broke up with Boyd because of his alcohol problems. In addition, defense counsel questioned and V.D. confirmed that in 2011 the police were called and Boyd went to jail because a fight occurred where Boyd choked S.D.A. V.D. and S.B. both confirmed that, shortly before V.D. broke up with Boyd in 2015, S.B. called the police and Boyd was taken to jail because of his disorderly conduct. S.D.A. admitted that after Boyd had moved out of the house she gave him rides to his court dates resulting from the disorderly conduct.

After the State's presentation of evidence, the defense rested. In closing, defense counsel challenged the lack of evidence, argued S.D.A.'s story was not true, and contested all of the witnesses' credibility. The jury convicted Boyd of committing one count of criminal sodomy of a child who is 14 or more years of age but less than 16 years of age, and one count of aggravated indecent liberties with a child for engaging in sexual intercourse with a child who is 14 or more years of age but less than 16 years of age.

Before sentencing, Boyd moved for a downward dispositional departure. The presentence investigation report (PSI) indicated that S.D.A.'s victim impact statement requested restitution for a lost Pell grant that she needed to repay in the amount of $1,248.34. According to the PSI, S.D.A. lost the grant because she was unable to complete college due to the trauma caused by Boyd's actions. At sentencing, the district court denied Boyd's departure motion and sentenced him to a controlling 125-month prison term. The district court also awarded S.D.A. $1,248.34 in restitution upon finding S.D.A. lost the Pell grant as a result of the psychological issues she endured from Boyd's actions.

Boyd timely appeals.

4

I.    DID THE STATE COMMIT PROSECUTORIAL ERROR DURING VOIR DIRE?

Boyd argues the prosecutor committed prosecutorial error by destroying the jury's power of nullification during voir dire. The State argues that the prosecutor's statements were correct statements of the law.

A.    *Standard of Review*

Boyd concedes he did not object to the prosecutor's comments during voir dire. Even so, a defendant may raise prosecutorial error claims without a contemporaneous objection at trial for comments made during voir dire, opening statements, and closing argument. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012). An appellate court uses a two-step process to evaluate claims of prosecutorial error. First, we determine whether error occurred and, if so, whether there was prejudice. In determining whether error occurred, we "must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If prosecutorial error is found, we then determine whether the error prejudiced the defendant's right to a fair trial. Evidence of prejudice is evaluated under the traditional constitutional harmless error inquiry established in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109. Our Supreme Court has clarified that

> "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt
> that the error complained of will not or did not affect the outcome of the trial in light of
> the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to
> the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 565
> U.S. 1221 (2012)." 305 Kan. at 109.

5

B.      *Did the State commit prosecutorial error?*

The prosecutor made the following statement during voir dire:

"[A] couple of legal principles, your job in this case is multifold, but *one of them is to follow the law*.

"And so let's say this was a marijuana case, and you are adamant that marijuana should be legal in the state of Kansas, and you are attending marijuana rallies attempting to go the way of Colorado and some of the other states.

"At the end of the day you would get an instruction from the Court saying if you find that the Defendant possessed marijuana, you must find him guilty if you find it beyond a reasonable doubt.

"You may disagree with that law, but does anyone here feel that if they're given the law, that they're going to vote contrary to the law just because they don't agree with the law? Does that make sense? I see no hands.

"*So the point is that you have to follow the law. You're going [to] take an oath to follow the law. If you want to change the law, it's not in the jury box; it's in the legislature*. Does anyone disagree with that concept? I see no hands." (Emphases added).

Our Supreme Court has stated:

"The purpose of voir dire is to enable the parties to select competent jurors who are without bias, prejudice, or partiality. The nature and scope of the voir dire examination is generally entrusted to the sound discretion of the trial court. In determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate courts independently evaluate the circumstances. [Citation omitted.]" *State v. Robinson*, 306 Kan. 431, 444, 394 P.3d 868 (2017).

Our Supreme Court has also explained that the "'[t]reatment of legal points in the course of voir dire examination should be strictly confined to those inquiries bearing on possible bias in relation to the issues of the case.'" *State v. Simmons*, 292 Kan. 406, 412, 254 P.3d 94 (2011) (quoting ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.3[c] [3d ed. 1993]).

"Jury nullification is defined as:

"'A jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.' [Citation omitted.]" *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008).

While jurors have "the raw physical power to disregard both the rules of law and the evidence in order to acquit a defendant," a juror has a duty "to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict." *State v. McClanahan*, 212 Kan. 208, Syl. ¶ 3, 510 P.2d 153 (1973). Moreover, "[w]hen the trial is to a jury, questions of law shall be decided by the court and issues of fact shall be determined by the jury." K.S.A. 22-3403(3). Kansas law also requires jurors to take an oath: "The jurors must swear or affirm to try the case conscientiously and return a verdict according to the law and the evidence." K.S.A. 2018 Supp. 60-247(d).

In *State v. Smith-Parker*, 301 Kan. 132, 163, 340 P.3d 485 (2014), the district court instructed the jury: "If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty.'" On appeal, the defendant argued the instruction should have used the word "should" instead of "will." 301 Kan. at 163. Our Supreme Court agreed and held that the words "'must'" and "'will' . . . fly too close to the sun of directing

7

a verdict for the State. A judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." 301 Kan. at 164.

Subsequently, in *State v. Allen*, 52 Kan. App. 2d 729, 733, 372 P.3d 432 (2016), *rev. denied* 306 Kan. 1320 (2017), the panel considered whether "should" was a synonym for "must" when reviewing an alleged nullification error in jury instructions on reasonable doubt:  "'If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *should* find the defendant guilty.' (Emphasis added.)" In applying *Smith-Parker*, the *Allen* panel held that there was no instructional error and noted that "'unlike the words must, shall, and will, the word should does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path.' [Citation omitted.]" 52 Kan. App. 2d at 735.

Boyd argues that *Allen* and subsequent decisions such as *State v. Stansbury*, No. 117,430, 2018 WL 1659933 (Kan. App.) (unpublished opinion), *rev. denied* 308 Kan. 1601 (2018), were wrongly decided. Boyd contends we should find the prosecutor's remarks during voir dire—"So the point is that you *have* to follow the law. You're going [to] take an oath to follow the law. If you want to change the law, it's not in the jury box; it's in the legislature." (Emphasis added.)—were misstatements of the law under *Smith-Parker*.

Other panels of this court have rejected similar arguments and have held that such statements made by a prosecutor during voir dire—that jurors must follow the law as instructed by the court—were proper. See *State v. Alvarez*, No. 112,637, 2016 WL 1169395, at *8 (Kan. App. 2016) (unpublished opinion); see also *State v. Patrick*, No. 116,660, 2018 WL 4373053, at *10 (Kan. App. 2018) (unpublished opinion) (finding prosecutor's statement that jurors must follow law not improper during voir dire), *rev. denied* 309 Kan. ___ (April 29, 2019); *State v. Spalding*, No. 114,561, 2017 WL

1433513, at *7 (Kan. App.) (unpublished opinion) (same); *State v. Cuellar*, No. 112,535, 2016 WL 1614037, at *3 (Kan. App. 2016) (unpublished opinion) (same).

In *Alvarez*, the prosecutor made statements similar to those Boyd complains of. Alvarez argued that the prosecutor's statements during voir dire were prosecutorial error because they diluted the jury's right of nullification.

> "'Now, explained—[we] explained about your job earlier where you all are required to look at the evidence that is presented in court, take the instructions that the Judge will give you and to decide from those facts or evidence that's presented what your verdict is gonna be. Now, unfortunately, I don't make the law. None of us make the law, at least I don't think in this room.
>
> "'Does everyone understand that even if you don't agree with the laws, drug laws, any type of law, that the only way to fix that is to go to your legislature, go to your Congress person to champion them to make a different law? It's not here in the courtroom. Does everyone understand that? Can everyone agree that no matter what their feelings are about drug law, drug cases [good] or bad, that they'll be able to set aside their personal feelings in order to come with a fair verdict? Does everyone agree that they will apply the law whether or not you agree with it? All right.'" 2016 WL 1169395, at *6-7.

The panel disagreed the statements amounted to prosecutorial error and, in doing so, found *Smith-Parker* distinguishable. The panel reasoned the prosecutor's statements during voir dire appeared to address the jurors' ability to apply the law and gauged the potential jurors' bias. The use of the word "will" did not compare to its use in *Smith-Parker* because the prosecutor used "will" as a question—not a statement—about the jurors' ability to follow the oath. The panel found *Smith-Parker* dissimilar because the judge made the statements after the close of evidence, while the prosecutor in *Alvarez* asked the question before the jurors had heard any evidence or argument in the case. The panel also found Alvarez' argument unpersuasive that the prosecutor misstated the law on

9

jury nullification when inquiring "if the potential jurors understood that laws were changed by the legislature, not in the courtroom." 2016 WL 1169395, at *7-8.

> "[T]his argument mischaracterizes nullification. Jury nullification is a 'knowing and deliberate rejection of the evidence or refusal to *apply* the law,' not to change the law. (Emphasis added.) The prosecutor's statement was just a simple description of the structure of our government and constitution. The legislature has the power to make and change the laws; the executive branch has the power to enforce the laws; and the judiciary has the power to interpret and apply the laws. The prosecutor did not make a misstatement of law, and there was no prosecutorial misconduct. [Citations omitted.]" 2016 WL 1169395, at *8.

We find the reasoning in *Alvarez* persuasive. Here, the prosecutor appeared to question the jurors' ability to follow the law and gauged the jurors' potential biases. The prosecutor referenced the oath each juror must take under K.S.A. 2018 Supp. 60-247(d)—"to try the case conscientiously and return a verdict according to the law and the evidence"—and the prosecutor's questions occurred before any presentation of evidence and argument. Although the statement at issue—that the jurors *have* to follow the law— differs from *Smith-Parker* and *Alvarez,* the prosecutor did not misstate the law. Thus, no prosecutorial error occurred.

II.    DID THE DISTRICT COURT CLEARLY ERR IN NOT GIVING A LIMITING INSTRUCTION UPON ADMISSION OF K.S.A. 60-455 EVIDENCE?

Boyd also argues the district court should have given a limiting instruction concerning the use of his prior bad acts or other crimes evidence—the alleged prior battery (choking) of S.D.A. and disorderly conduct which led to police intervention—as required under K.S.A. 2018 Supp. 60-455. Boyd argues the district court committed clear error in failing to instruct the jury to limit the consideration of the evidence to its proper use and not to consider the evidence as proof of his propensity to commit criminal acts.

10

The parties recognize that Boyd's failure to request a limiting instruction or to object to the lack of a limiting instruction with the admission of K.S.A. 60-455 evidence does not bar Boyd from contesting the issue for the first time on appeal but requires us to review the instructional issue under the clearly erroneous standard. See *State v. Breeden*, 297 Kan. 567, 582-83, 304 P.3d 660 (2013).

> "When error in the giving or failing to give a jury instruction is claimed, the court analyzes whether the jury instruction is legally and factually appropriate and, if so, whether the error is harmless. *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 516, 286 P.3d 195 (2012). But where the instruction error is raised for the first time on appeal, the failure to give a legally and factually appropriate instruction will result in reversal only if the failure was clearly erroneous. K.S.A. 2015 Supp. 22-3414(3); *State v. Breeden*, 297 Kan. 567, 581, 304 P.3d 660 (2013). To establish a clearly erroneous instruction error, the defendant must firmly convince the court the jury would have reached a different result without the error. *Williams*, 295 Kan. at 516." *State v. Solis*, 305 Kan. 55, 64-65, 378 P.3d 532 (2016).

The "admissibility of any and all other crimes and civil wrongs evidence will be governed by K.S.A. 60-455." *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006). Subject to exception, evidence of prior bad acts or other crimes evidence is inadmissible to show a person's propensity to commit crimes. K.S.A. 2018 Supp. 60-455(a). But evidence of prior bad acts or other crimes "is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2018 Supp. 60-455(b). If a district court admits prior bad acts or other crimes evidence, "the district judge must give a limiting instruction informing the jury of the specific purpose for admission." 282 Kan. 39, Syl. ¶ 3. But a district court's failure to give a limiting instruction for the admission of K.S.A. 60-455 evidence does not result in automatic reversal. 282 Kan. at 58.

11

Preliminarily, the State points out and Boyd concedes that he primarily introduced the prior bad acts or other crimes evidence on cross-examination or recross-examination of the witnesses. In addition, Boyd concedes he elicited the witnesses' testimony about his prior bad acts or other crimes evidence to support his theory of defense that S.D.A. fabricated the allegations to permanently remove Boyd from the house.

Notably, the State does not argue that the invited error rule should apply to Boyd's claim. Generally, the invited error doctrine bars litigants from complaining of an error on appeal where he or she invited or prompted the error at the district court level. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014); *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d 787 (2013). In *State v. Anthony*, 282 Kan. 201, 145 P.3d 1 (2006), a detective testified at the trial during defense's cross-examination about a prior threat Anthony allegedly made against the victim. Anthony was convicted of the first-degree premeditated murder of that victim. Our Supreme Court held the invited error rule applied to bar Anthony's claim that the district court erred in failing to give a limiting instruction for the admission of K.S.A. 60-455 evidence because the defense elicited the improper evidence from the witness during cross-examination. 282 Kan. at 215. Generally, since *Anthony*, some panels of this court have found the invited error doctrine applies when the defense elicits the K.S.A. 60-455 evidence. See *State v. Arnold*, No. 99,834, 2009 WL 1140273, at *2-3 (Kan. App. 2009) (unpublished opinion); *State v. King*, No. 95,088, 2007 WL 2043565, at *5 (Kan. App. 2007), *aff'd* 288 Kan. 333, 204 P.3d 585 (2009); see also *State v. Weis*, No. 113,069, 2016 WL 1169453, at *4 (Kan. App. 2016) (unpublished opinion) (discussing but declining to apply invited error rule where defense questions meant only to clarify witness' testimony, not elicit prior bad acts evidence).

Here, defense counsel elicited the same prior bad acts or other crimes evidence during cross- and recross-examination of the witnesses that Boyd now argues requires reversal for the district court's failure to provide a limiting instruction. However, the State

does not argue or brief whether the invited error doctrine bars this court from considering the claim on appeal. Generally, issues inadequately briefed and points raised incidentally in a brief but not argued therein are deemed waived or abandoned. *State v. Tappendick*, 306 Kan. 1054, Syl. ¶ 2, 400 P.3d 180 (2017).

Boyd acknowledges he used the evidence to assert his theory of defense that S.D.A. fabricated the allegations to remove Boyd from the house because of her dislike of his chaotic and inconsistent presence in her life. Boyd argues the district court should have given a limiting instruction even though the evidence was admitted by the defense, citing for support *State v. Molina*, 299 Kan. 651, 325 P.3d 1142 (2014). There, our Supreme Court rejected an invited error argument:

> "[T]he State . . . argues Molina waived entitlement to a prophylactic limiting instruction by introducing the evidence as part of his defense. Although evidence of Molina's drug possession and his intent to sell came in through the defense, the need for a limiting instruction on other crimes evidence does not depend upon which party introduces the evidence. Instead, as we held in *Breeden*, 'a trial court judge who admits K.S.A. 2012 Supp. 60-455(b) evidence must give a limiting instruction informing the jury of the specific purpose for admission of the evidence in order to avoid error.' 297 Kan. at 579. This is true regardless of which party proposes the evidence." 299 Kan. at 660.

Boyd's argument based on *Molina* may have merit. Nevertheless, even if we assume error, the error does not require reversal. Boyd must firmly convince us the jury would have reached a different verdict had the district court given a limiting instruction for Boyd's other crimes evidence. Based on the verdict, the jury rejected this theory at trial.

The evidence of Boyd's alleged battery and prior disorderly conduct did not show that Boyd had a propensity to commit aggravated indecent liberties with a child and criminal sodomy. See *Breeden*, 297 Kan. at 584 (finding under clear error review,

13

Breeden's threatened violence to victim did not specifically show propensity to commit sodomy). A properly worded limiting instruction would not have made a difference because the State presented overwhelming evidence through S.D.A.'s and S.B.'s testimony that Boyd committed the crimes. Thus, Boyd cannot show the district court's failure to give a limiting instruction for the prior bad acts or other crimes evidence requires reversal under the clear error standard.

III.    WAS THE RESTITUTION AWARD CAUSALLY LINKED TO BOYD'S CRIMES?

Boyd's third contention of error on appeal asserts the district court erroneously awarded restitution because his crimes are not causally connected to S.D.A.'s restitution claim of $1,248.34 for a lost Pell grant.

A.      *Procedural Background*

At Boyd's sentencing in December 2017, the district court found the PSI contained S.D.A.'s witness impact statement requesting restitution of $1,248.34 for a lost Pell grant.

> "'Over the last 4 years my relationship with my mother and little brother suffered because of [Boyd's] manipulative tactics. I attended college and dropped out because of stress and hop[e]lessness. Since everything has come out I've been admitted and discharged from Shawnee Mission's mental hospital. I was diagnosed with PTSD, anxiety and depression, and insomnia. I've struggled from nightmares, extreme depression, and thoughts of suicide. Due to this keeping a job and clear head was hard to do.'"
>
> "[S.D.A.] is requesting restitution in the form of repayment of her Pell Grant. She was unable to finish school due to the trauma caused by the defendant."

Boyd simply objected to restitution generally. The State argued Boyd did not object to the amount but to whether S.D.A.'s claim qualified as restitution. Boyd

confirmed he did not object to the amount or what made up the amount of restitution but whether restitution was owed.

At the sentencing hearing, S.D.A. stated, "[T]he acts that I went through really kind of tore my family apart, tore me apart. I've been diagnosed with PTSD, insomnia, and depression." S.D.A. also read a poem that she wrote but made no statements relating to restitution. The district court awarded S.D.A. restitution, stating:

> "I will also find that the restitution requested by [S.D.A.] in the amount of $1,248.34 can be quite logically and causally connected to the ongoing trauma not only of this life that you put her into, but also as she continued to grapple with and continued to suffer from your manipulations, your power and control over her, and that I think that [S.D.A.'s] request very clearly sets out—it's stated it is the Pell grant that she lost as a result of the psychological issues that she endured associated with your actions."

B.      *Standard of Review and Legal Standard*

> "'Issues regarding the amount of restitution and the manner in which it is made to the aggrieved party are normally subject to review under an abuse of discretion standard. A district judge's factual findings underlying the causal link between the crime and the victim's loss are subject to a substantial competent evidence standard of review. And this court has unlimited review over interpretation of statutes.' [Citations omitted.]" *State v. Martin*, 308 Kan. 1343, 1349-50, 429 P.3d 896 (2018).

"'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). In reviewing for substantial competent evidence, "the appellate court does not reweigh the evidence or assess the credibility of witnesses." *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019).

K.S.A. 2018 Supp. 21-6604(b)(1) requires a district court to base restitution in a criminal case on the "damage or loss caused by the defendant's crime." Likewise, K.S.A. 2018 Supp. 21-6607(c)(2) states the district court may order a defendant—as a condition of probation—to "make reparation or restitution to the aggrieved party for the damage or loss caused by the defendant's crime." As a result, "'restitution for a victim's damages or loss depends on the establishment of a causal link between the defendant's unlawful conduct and the victim's damages.' [Citations omitted.]" *State v. Alcala*, 301 Kan. 832, 837, 348 P.3d 570 (2015).

Our Supreme Court recently adopted a new standard in *State v. Arnett*, 307 Kan. 648, 654-55, 413 P.3d 787 (2018):

"Generally, causation-in-fact requires proof that it is more likely than not that, but for the defendant's conduct, the result would not have occurred.

"Legal cause limits the defendant's liability even when his or her conduct was the cause-in-fact of a result by requiring that the defendant is only liable when it was foreseeable that the defendant's conduct might have created a risk of harm and the result of that conduct and any contributing causes were foreseeable. When causation is based on a chain of events, an intervening cause may absolve the defendant of liability. However, '[i]f the intervening cause is foreseen or might reasonably have been foreseen' by the defendant, his or her conduct may still be considered to have proximately caused the result.

. . . .

"Today we explicitly conclude that the causal link between a defendant's crime and the restitution damages for which the defendant is held liable must satisfy the traditional elements of proximate cause: cause-in-fact and legal causation. [Citations omitted.]"

16

Before *Arnett*, our Supreme Court reviewed whether a causal link was established differently. The *Alcala* court provides a good example of the previous standard:

"[T]he realities of attributing the consequences of criminal conduct present a range of possibilities for restitution—some more easily resolved than others. For example, losses directly or immediately caused by criminal conduct, such as injuries to persons or property, are clearly compensable as restitution. See *Goeller*, 276 Kan. at 582-83 (causation requirement met in DUI case to compensate victim for medical bills incurred after collision with intoxicated defendant who drove his vehicle left of center); *State v. Sammons*, 276 Kan. 574, 576-77, 78 P.3d 470 (2003) (restitution for value of tools stolen and not recovered because victim would have use of the tools but for the theft).

"But the issue presented in this case resides somewhere toward the other end of the spectrum—where the outcome has not been so clear because the losses were more tangentially caused by the criminal conduct. Compare *Hall*, 298 Kan. at 991 (upholding restitution for sexual assault victim's relocation expenses when defendant lived and worked in same apartment complex and law enforcement advised victim to move for her safety); *Hand*, 297 Kan. at 739-40 (increased insurance premium due to theft claim against policy); and *State v. Beechum*, 251 Kan. 194, 202-03, 833 P.2d 988 (1992) (upholding restitution award for costs of moving murder victim's child to child's other parent); with *State v. Hunziker*, 274 Kan. 655, 657-58, 664-68, 56 P.3d 202 (2002) (discretion abused by awarding victim's attorney fees for advising on court procedures and preparation of a 'restitution booklet' detailing losses caused by vandalism)." 301 Kan. at 837-38.

C.       *Is a remand necessary for the district court to review the issue under the new standard?*

Significantly, neither party requests a remand for the district court to conduct an analysis under the *Arnett* standard. The parties also agree the proximate cause standard applies to our review. The district court, however, did not have the *Arnett* court's guidance at the time of its ruling.

17

In *Arnett*, our Supreme Court discussed whether to remand for a review under the newly articulated standard but found a remand unnecessary because Arnett did not dispute the factual findings; the Court of Appeals panel decided the issue as a matter of law; and, while the ruling did not use the express proximate-cause terms, the language supported that the district court made the cause-in-fact and the legal cause findings. 307 Kan. at 655-56.

However, in two later decisions, our Supreme Court did order a remand for the district court to conduct a review under the *Arnett* standard. In *State v. Futrell*, 308 Kan. 128, 131-32, 418 P.3d 1262 (2018), the court remanded because the district court did not explain its reasoning and a factual deficiency in the record prevented its independent review. In *State v. Martin*, 308 Kan. 1343, 1352, 429 P.3d 896 (2018), the court remanded because the district court failed to conduct a restitution hearing, the summary holding applied an incorrect legal standard that did not determine whether Martin's crimes caused all the damages, and the victim's itemized list of damages appeared to include expenses incurred *before* the crimes—making the causal link finding to the crimes improper.

The majority of another panel of this court in *State v. Kraft*, No. 117,658, 2018 WL 1884045, at *7 (Kan. App. 2018) (unpublished opinion), remanded the restitution issue to the district court. In relevant part, Kraft was originally charged with domestic battery and criminal restraint, following an altercation. The victim, Haley Fryback, requested restitution for payment of medical and psychological bills. The State dropped the domestic battery charge under the plea agreement and did not provide for payment of restitution to the victim in that agreement. After sentencing, the district court awarded the victim restitution in full upon finding the claimed losses were closely entwined with Kraft's conviction for criminal restraint. On appeal, the panel majority held it could not conduct a causation analysis under *Arnett*. Specifically, the majority found the medical

18

bills for the victim's physical injuries were arguably causally linked to Kraft's criminal restraint but found:

> "Fryback's claim for psychological treatment from the criminal restraint is more problematic. Fryback attributed her inpatient treatment at Sovereign Health of California to her dependency on Kraft and the fact that she was 'still very attached, and romanticizing on him.' Fryback testified that her outpatient therapy at High Plains Mental Health was the result of the long-term mental and physical abuse she had suffered during her six-month relationship with Kraft. At the restitution hearing, the prosecutor conceded: 'This was not a single incident of abuse, but a long period of abuse, verbal, mental, and physical abuse.' However, Kraft was convicted of one count of criminal restraint on May 12, 2016, not a pattern of such criminal conduct." 2018 WL 1884045, at *6.

The panel majority also found the district court's lack of explicit factual findings and the fact the district court did not have the *Arnett* court's guidance in deciding the issue required a remand. In pertinent part, the panel found that "it is difficult to discern a 'but for' relationship between her inpatient and outpatient counseling bills and Kraft's single act of criminal restraint" because the district court did not expressly distinguish between the medical and psychological bills. 2018 WL 1884045, at *6. The panel also held that the lack of explicit findings prevented an independent substantial evidence review of proximate cause under the *Arnett* standard. 2018 WL 1884045, at *7.

In her dissent, Chief Judge Arnold-Burger found a remand unnecessary based on the district court's findings and Fryback's testimony describing the altercation:

> "The district court judge correctly and specifically found that the criminal restraint and the domestic battery were so closely entwined that he could not separate them in terms of restitution. To bolster his conclusion, he noted the difficulty that the psychiatrist had in separating the two. I have no trouble concluding that the judge's decision was supported by substantial competent evidence. Clearly, in order to beat Fryback, and prevent her from escaping his rage, he had to restrain her. He did this by the

psychological control he had exerted over Fryback during their relationship, as well as by taking her car keys so she could not leave. He further prevented her from calling for help or a ride by taking her phone. Also due to her restraint, there was a delay in getting her to the hospital of at least two hours. Because it is more likely than not that had Kraft not restrained her, Fryback would have fled the scene or called for help and avoided injury, there is sufficient evidence to establish causation in fact. Second, it was foreseeable that Kraft's conduct of restraining Kraft so that he could beat her, created a risk of harm and the result of that conduct—serious physical and psychological injury to Fryback—were foreseeable. It is clear to me that there is substantial competent evidence to support a finding of legal causation. As the district court judge indicated, it is simply impossible to separate the criminal restraint from the battery. The restraint was necessary to effectuate the battery." 2018 WL 1884045, at *9.

The instant case does not directly fit into any of the above caselaw. Unlike *Arnett*, Boyd disputes the factual findings supporting the district court's ruling. That said, a factual discrepancy does not likely prevent an independent review of the issue. Unlike *Martin*, the district court here granted restitution to S.D.A. for a loss she incurred after Boyd's crimes. In comparison to *Futrell*, no similar factual discrepancy prevents an independent review. S.D.A. requested restitution for a Pell grant she lost after suffering psychological issues following Boyd's crimes. Last, unlike *Kraft*, the restitution issue does not concern two separate claims that lack sufficient factual findings on each claim to conduct a proximate cause review.

That said, Boyd's convictions more indirectly caused S.D.A.'s claimed loss. The record does not set out a timeframe for when S.D.A. dropped out of college, lost the Pell grant, and endured all her psychological or mental health problems. However, all the experiences in S.D.A.'s victim impact statement occurred before August 2016 (the completion date of the statement). The district court did not find S.D.A.'s inability to finish college and her loss of the Pell grant stemmed from any particular psychological issue but found Boyd's crimes caused all of S.D.A.'s psychological issues, which caused

20

her to lose the grant. As a result, we see no factual discrepancy requiring a remand for a review under the *Arnett* standard.

The district court clearly stated its reasoning, holding Boyd's crimes were logically and causally connected to S.D.A.'s loss because S.D.A. had endured psychological issues caused by Boyd's crimes that resulted in the lost Pell grant. However, the district court used language similar to the old standard under *Alcala* and made no express proximate cause findings. Even so, the district court's findings still supported the conclusion that but for Boyd's crimes S.D.A.'s psychological issues would not have occurred and the resulting loss of the Pell grant was a foreseeable result of Boyd's criminal acts. See *Arnett*, 307 Kan. at 656.

D.     *Does substantial evidence support the district court's finding of a proximate cause between Boyd's crimes and S.D.A.'s claimed loss?*

The district court held Boyd's offenses were logically and causally connected to S.D.A.'s lost Pell grant. The district court also held S.D.A. established the Pell grant was lost because of the psychological issues she endured from Boyd's actions.

On appeal, Boyd's principal argument is that no evidence supports S.D.A.'s restitution claim. Boyd questions whether the record establishes that S.D.A. attended college and lost a Pell grant. Boyd also briefly challenges whether S.D.A. could establish the causal link between his crimes, S.D.A.'s mental health diagnoses, and her inability to attend college without expert testimony.

A defendant must raise an objection to restitution to preserve the issue for appeal. *State v. Shank*, 304 Kan. 89, 94, 369 P.3d 322 (2016). In general, issues not raised before the district court cannot be raised on appeal. *State v. Hunziker*, 274 Kan. 655, 661, 56 P.3d 202 (2002); see *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). While

21

exceptions to the general rule exist, Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34) requires an appellant to explain why an issue not raised below should be considered for the first time on appeal. Our Supreme Court warned that litigants who fail to comply with this rule do so at their own peril and that Rule 6.02(a)(5) would be strictly enforced. *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014); *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015).

The State correctly argues that Boyd lodged no objection to the PSI as establishing S.D.A.'s claim of restitution. Boyd also lodged no objection to the reliability of S.D.A.'s mental health evidence or that the restitution claim was unsupported by the evidence. Instead, Boyd expressly limited his objection to whether his crimes caused S.D.A.'s claimed loss or qualified as restitution. Thus, Boyd has failed to preserve his arguments on appeal disputing the factual existence and the reliability of the evidence supporting S.D.A.'s claimed loss. Also, Boyd does not explain why we should consider his arguments for the first time on appeal as required by Rule 6.02(a)(5). Accordingly, we find his arguments waived or abandoned.

As a result, we limit our review to whether S.D.A.'s lost Pell grant qualifies for inclusion in the restitution order because Boyd's crimes caused her loss. In general, "the question of whether an item claimed by the aggrieved party as loss qualifies for inclusion in a restitution order because it was caused by the defendant's offense is a question of law. An appellate court's review of conclusions of law is unlimited." *Hunziker*, 274 Kan. 655, Syl. ¶ 2. As stated above, we review the factual findings for substantial competent evidence. See *Martin*, 308 Kan. at 1349.

Proof of causation at restitution hearings is reviewed under a "less stringent" standard. See *State v. Stanley*, No. 116,614, 2017 WL 6542922, at *4 (Kan. App. 2017) (unpublished opinion), *rev. denied* 308 Kan. 1600 (2018). Although reviewed under the previous causation standard, *State v. Jones*, No. 111,078, 2015 WL 1947120 (Kan. App.

2015) (unpublished opinion), and *State v. Phillips*, No. 89,352, 2003 WL 22176026 (Kan. App. 2003) (unpublished opinion), provide some helpful insight into the level of proof required to establish causation in a restitution hearing.

In *Phillips*, 2003 WL 22176026, the defendant argued his two convictions of attempted aggravated indecent liberties did not causally connect to his stepdaughter's (the victim's) chiropractic bills. The panel disagreed, holding the evidence showed Phillips had battered and sexually abused his stepdaughter for at least 14 years. His stepdaughter testified Phillips had physically abused her since the age of 4; the sexual abuse started at age 12 and ended when she moved out of the house at age 16. While she testified the spinal injuries did not result from the sexual abuse, she stated Phillips hit her over the head several times. The panel held: "It would be illogical to conclude that she received no injuries from this abuse. Based on that connection, we conclude the victim's injuries were caused by defendant's sexual attacks upon her, and the trial court did not err in ordering the restitution in question." 2003 WL 22176026, at *1.

In *Jones*, 2015 WL 1947120, the defendant robbed a nine-year-old child of a backpack containing gold jewelry in the presence of the child's mother. At sentencing, the district court granted the Crime Victims' Compensation Board (CVCB) restitution for both victims' later psychological counseling. On appeal, Jones argued the district court erred in granting restitution. The panel disagreed:

> "[B]oth J.G. and his mother explained to the district court how Jones' robbery of J.G. in the presence of his mother had directly caused psychological damage to their sense of security and emotional well being. Similar to the physical harm incurred by J.G. which resulted in $655 worth of medical bills, the psychological harm sustained by J.G. and his mother was directly caused by Jones' criminal conduct. The district court had a substantial competent basis to find that the costs of psychological counseling were not tangential but directly caused as a result of the crime committed by Jones. We hold the

23

district court did not abuse its discretion by awarding restitution to the CVCB for its costs in providing psychological therapy to J.G. and his mother." 2015 WL 1947120, at *3.

Here, S.D.A. did not testify about her restitution claim at the hearing. But S.D.A. completed a victim impact statement in August 2016, and the PSI quoted S.D.A.'s statement that established she had received mental health diagnoses; suffered other mental health-related issues; had been discharged from a mental health hospital; and had attended college, dropped out, and lost a Pell grant. S.D.A. did not state the timeframe for when all the above experiences occurred. But S.D.A. requested restitution for the repayment of the Pell grant—totaling $1,248.34—because "[s]he was unable to finish school due to the trauma caused by the defendant."

At the trial in August 2017, S.D.A. was 20 years old. S.D.A. testified the sexual abuse started when she was 14 years old and continued throughout and after her time in high school. In describing how the abuse began, S.D.A. stated she did not want the acts to happen; she would tell Boyd to stop, but he would continue. S.D.A. stated that Boyd told her that he was addicted to her and he would release her when she turned 18. As charged, Boyd's crimes occurred between August 2011 and May 2013. Logic dictates the events described in S.D.A.'s impact statement—her mental health, inability to complete college, and the loss of the Pell grant—all occurred before August 2016.

Admittedly, S.D.A.'s claimed loss was not directly caused by Boyd's crimes. But we find the district court did not err in finding that Boyd's crimes were the proximate cause of S.D.A.'s lost Pell grant. Under the cause-in-fact analysis, but for Boyd's crimes, S.D.A. would not have lost the Pell grant because she would not have suffered from the psychological issues that affected her ability to finish college. Boyd's manner of committing the crimes for about a two-year period more likely than not caused S.D.A. to suffer from psychological issues, become unable to finish college, and lose the Pell grant.

24

Boyd's crimes also constitute the legal cause. This case involves a chain of events. In general, Boyd's crimes of sexually abusing S.D.A. from age 14 up to (and after) the time she reached 16 years of age carried foreseeable risks of harm that S.D.A. would suffer psychological issues that negatively impacted her ability to finish college a few years after the crimes. The record supports that while Boyd was charged with two criminal counts, the sexual abuse remained ongoing and continued throughout that period. In addition, substantial evidence supports that the two criminal counts created a chain of foreseeable risks of harm or foreseeable contributing causes that led to S.D.A.'s claimed loss: S.D.A.'s psychological issues and inability to finish college led S.D.A. to lose the Pell grant.

Boyd argues, however, that we should find his crimes too attenuated in time to support a finding that his criminal conduct caused S.D.A. to lose the Pell grant. Boyd's argument lacks merit. S.D.A. lost the Pell grant only a few years after Boyd's crimes. And S.D.A.'s description of the sexual abuse provides support that Boyd's crimes were the proximate cause of S.D.A.'s claimed loss. Namely, the evidence supported that Boyd's crimes negatively affected S.D.A.'s mental health, which impacted her ability to finish college and led to the lost Pell grant.

Last, Boyd argues the only evidence at trial of S.D.A.'s mental state showed she had mental health problems before his crimes. Boyd points to Shearer's testimony of S.D.A.'s statements during her interview that she felt she was taken advantage of because of her weak state of mind and that she had had low self-esteem from an early age, a low self-image, and had been bullied.

The problem is that Boyd did not object to S.D.A.'s statements in the PSI that she received the mental health diagnoses and suffered other psychological-related issues after Boyd's crimes. S.D.A.'s mental state before the crimes do not compare to her mental health diagnoses after the crimes—PTSD, depression, anxiety, and insomnia. We are

25

unpersuaded by Boyd's attempt to minimize the effect of his crimes on S.D.A.'s mental health. Substantial competent evidence supports the district court's factual findings that Boyd's crimes proximately caused S.D.A.'s lost Pell grant. The district court did not err.

IV.   DID THE DISTRICT COURT ABUSE ITS DISCRETION IN DENYING BOYD'S MOTION FOR DOWNWARD DISPOSITIONAL DEPARTURE?

Finally, Boyd argues that the district court abused its discretion in refusing to consider his motion for downward dispositional departure upon finding the motion was barred by K.S.A. 2018 Supp. 21-6818(a) because he had committed crimes of extreme sexual violence. The State contends that the district court did not err because it properly considered and denied the merits of Boyd's departure motion.

A.   *Jurisdiction*

"An appellate court has a duty to question jurisdiction on its own initiative." *State v. Marinelli*, 307 Kan. 768, 769, 415 P.3d 405 (2018). After denying Boyd's motion, the district court sentenced Boyd to a presumptive sentence. As a general rule, an appellate court lacks jurisdiction over and cannot review a presumptive sentence on appeal. K.S.A. 2018 Supp. 21-6820(c)(1); *State v. Kinder*, 307 Kan. 237, 239-40, 408 P.3d 114 (2018). But the parties agree we are permitted to review whether the district court misinterpreted its own statutory authority under the sentencing statutes and improperly refused to consider Boyd's motion for a discretionary nonpresumptive sentence. See, e.g., *State v. Warren*, 297 Kan. 881, Syl. ¶ 1, 304 P.3d 1288 (2013).

B.   *Standard of Review*

We review a district court's decision to deny a departure motion for an abuse of discretion. See *State v. Ibarra*, 307 Kan. 431, 433, 411 P.3d 318 (2018). "The party

26

asserting an abuse of discretion bears the burden of establishing such abuse." *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017). An abuse of discretion occurs if a district court applies the incorrect legal standard or relies on an erroneous legal conclusion. *State v. Warrior*, 294 Kan. 484, Syl. ¶ 13, 277 P.3d 1111 (2012); *State v. Woodward*, 288 Kan. 297, 299, 202 P.3d 15 (2009). "Likewise, the district court's failure to exercise its discretionary authority can be grounds for reversal." *State v. Brinklow*, 288 Kan. 39, 42, 200 P.3d 1225 (2009). An appellate court has unlimited review over the interpretation of statutes. See *State v. Hall*, 298 Kan. 978, 982-83, 319 P.3d 506 (2014).

According to K.S.A. 2018 Supp. 21-6818(a), "[t]he sentencing judge shall not impose a downward dispositional departure sentence for any crime of extreme sexual violence, as defined in K.S.A. 2018 Supp. 21-6815, and amendments thereto." K.S.A. 2018 Supp. 21-6815(c)(2)(F)(i) defines a "'[c]rime of extreme sexual violence'" in relevant part as

"a felony limited to the following:

(a) A crime involving a nonconsensual act of sexual intercourse or sodomy with any person;

(b) a crime involving an act of sexual intercourse, sodomy or lewd fondling and touching with any child who is 14 or more years of age but less than 16 years of age and with whom a relationship has been established or promoted for the primary purpose of victimization."

C.      *The record is unclear whether the district court considered and denied Boyd's departure motion.*

Boyd argues that the district court came to the erroneous legal conclusion that it lacked the authority and refused to consider his motion for departure under K.S.A. 2018

27

Supp. 21-6818(a). He claims there was no evidence to support a finding that his acts against the victim were nonconsensual or that he cultivated his relationship with the victim primarily to victimize her.

After the trial, Boyd filed a written motion for downward dispositional departure. In the motion, Boyd argued his alcohol abuse contributed to his actions and that a Heartland Regional Alcohol & Drug Assessment Center (RADAC) assessment had concluded Boyd was amenable to treatment. At sentencing, Boyd requested that the district court order his sentences to run concurrent and consider granting him a downward dispositional departure to probation. In support, Boyd argued that the district court should consider his lack of prior serious felonies; his lack of future contact with S.D.A. and her family; and the impact of Boyd's criminal history, alcohol use, domestic issues, and domestic violence on his life. In response, the State argued K.S.A. 2018 Supp. 21-6818(a) barred a dispositional departure because Boyd had committed crimes of extreme sexual violence and the district court should consider the egregious nature of the crimes, such as the ongoing threats of abuse to a child and his daughter's awareness of the abuse.

The district court requested the parties to present more argument on the issue of whether Boyd's convictions were crimes of extreme sexual violence. Boyd argued crimes of extreme sexual violence generally denote acts similar to forcible rape and his crimes of conviction did not fit the definition. The State presented the definition of crimes of extreme sexual violence under K.S.A. 2018 Supp. 21-6815(c)(2)(F)(i).

In deciding whether to depart, the district court first discussed Boyd's RADAC assessment recommendations, which included a finding that Boyd believed residential treatment was not an option for him. The district court also made the following statements:

28

"I believe under the statute as we've gone through and definition in [K.S.A.] 21-6815 as to the crime of extreme sexual violence, the convictions here for aggravated indecent liberties and sodomy fit within and are part of the definition—statutory definition of what a crime of extreme sexual violence is.

"Therefore, *the motion for a downward dispositional departure for the reasons requested by the Defendant will be denied.*

"Without recounting what the jury heard and what occurred before in prior evidentiary hearings, Mr. Boyd, as noted by the State, this was an ongoing continuous situation that you placed [S.D.A.] in, and perhaps the added depravity of your own daughter becoming aware of this, *and based upon that alone*, I will sentence you on Count 1, the charge of aggravated indecent liberties, in violation of K.S.A. 21-5506 sub (b) (1), sentence you to a term of 66 months in the custody of the Secretary of Corrections.

"On Count 2 for the crime of conviction of committing sodomy in violation of K.S.A. 21-5504 sub (a) (3), I will sentence you to a term of 59 months in the custody of the Secretary of Corrections.

"Count 2 will be consecutive to Count 1 for a controlling term of 125 months in prison." (Emphases added.)

We agree with Boyd that his crimes cannot be considered crimes of "extreme sexual violence" as defined by K.S.A. 2018 Supp. 21-6818(a) and K.S.A. 2018 Supp. 21-6815(c)(2)(F)(i). In *State v. Monroe*, No. 104,822, 2011 WL 6942941, at *4-5 (Kan. App. 2011) (unpublished opinion), another panel of our court, relying on *State v. McClennon*, 273 Kan. 652, 45 P.3d 848 (2002), held that only a jury can make the factual findings necessary to determine whether the crime of conviction constituted a crime of extreme sexual violence. The *Monroe* panel held that because the defendant pled guilty to the crime of aggravated indecent liberties with a child, a jury did not have the opportunity to make a factual determination of whether the defendant "'established or promoted' a

relationship with the victim for the 'primary purpose of victimization.'" 2011 WL 6942941, at *5. Accordingly, the panel ordered a remand for the district court to consider the merits of the defendant's departure motion. 2011 WL 6942941, at *5. The same should happen here.

As the elements of the offenses Boyd was convicted of did not include requiring the State to prove whether the acts were nonconsensual or whether Boyd established or promoted his relationship with the victim for the primary purpose of victimizing her, Boyd's convictions cannot be classified as crimes of extreme sexual violence. Therefore, the district court was not barred from considering the merits of Boyd's departure motion.

Moreover, we disagree with the State's contention that the district court considered the merits of Boyd's departure motion. To us, the record is unclear on this point. The decision of *State v. Coyne*, No. 105,082, 2012 WL 3135680 (Kan. App. 2012) (unpublished opinion), provides a useful contrast. There, Coyne pled guilty to one count of attempted aggravated indecent liberties with a child. Prior to sentencing, Coyne requested both dispositional and durational departures. The district court granted the durational departure but denied the dispositional departure, stating:

> "'I do not believe that the Court has the ability to depart further.
>
> "'And, I guess, I would tell you, Mr. Coyne, that even if I felt I did, with all the evidence before me, and particularly knowing that there are other victims, I would not grant you probation on this case.'" 2012 WL 3135680, at *2.

On appeal, Coyne argued the district court erred in denying his departure motion upon the erroneous legal conclusion that it lacked authority to review his motion under K.S.A. 2009 Supp. 21-4719 (now K.S.A. 2018 Supp. 21-6818) because he committed a crime of extreme sexual violence. In reviewing Coyne's claim, the panel held that it did not need to decide whether a dispositional departure was permitted because the district

30

court did not rely solely on a lack of authority to deny Coyne's motion. Rather, the panel held that the judge's comment about lacking authority had no legal significance because the judge found "Coyne would *not* receive a dispositional departure even if one was permitted because of 'the evidence before me' and 'knowing there are other victims.'" 2012 WL 3135680, at *2. As a result, the panel affirmed Coyne's sentence.

Unlike in *Coyne*, where the district court clearly denied the merits of the defendant's departure motion, the district court here did not expressly state that it was denying Boyd's departure motion based upon the merits. The district court specifically agreed with the State's contention that Boyd's crimes fit under the definition of a crime of extreme sexual violence then stated that "the motion for a downward dispositional departure for the reasons requested by the Defendant will be denied." It then proceeded directly to sentence Boyd without a detailed discussion of the evidence. Based upon the record before us, we are simply unsure whether the district court considered the merits of Boyd's departure motion before denying it.

Boyd was entitled to have the merits of his departure motion considered by the district court, and the district court erred in finding that it lacked discretion to consider Boyd's motion. Therefore, while we affirm Boyd's convictions, we vacate Boyd's sentences and remand with instructions for the district court to consider Boyd's departure motion and then resentence him.

Convictions affirmed, sentences vacated, and remanded with directions.